1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11

12   LIBERTY MUTUAL INSURANCE           Case No.: 3:11-CV-01419-MMC (JSC)
     COMAPNY, a Massachusetts Corporation,
13                                       **ORDER RE: DEFENDANT'S**
                                         **MOTION TO COMPEL**
             Plaintiff,                  **PRODUCTION OF DOCUMENTS**
14                                       **(Dkt. No. 26)**
        v.
15

16   THE CALIFORNIA AUTOMOBILE
     ASSIGNED RISK PLAN, a program
17   established under California Insurance
     Code section 11620 et seq., and Does 1
18   through 20, inclusive,

19             Defendants.

20         Now pending before the Court is Defendant's Motion to Compel Production of

21   Documents. (Dkt. No. 26.)  Having carefully considered the parties' written submissions,

22   and having had the benefit of oral argument on March 8, 2012, the Court GRANTS

23   Defendant's Motion to Compel in part and DENIES it in part.

24                    **FACTUAL & PROCEDURAL BACKGROUND**

25         The California Automobile Assigned Risk Plan ("CAARP") is a statutory program

26   designed to ensure that certain classes of high-risk motorists have access to automobile

27   insurance in California.  CAARP acts to accomplish this goal by hiring various insurance

28   companies to perform as "servicing carriers" under the Plan, and assigning them to otherwise

United States District Court
Northern District of California

1  uninsurable drivers.  The servicing carriers then issue independent policies to the individuals

2  to whom they are assigned.

3       Pursuant to a contract dated December 17, 1998, Defendant CAARP hired Plaintiff

4  Liberty Mutual Insurance Company ("Liberty Mutual" or "the company") to act as one such

5  servicing carrier ("the Servicing Carrier Agreement").  Under the terms of their contract,

6  CAARP agreed to indemnify Liberty Mutual for any damages, fees, or other costs resulting

7  from its performance in that role ("the Indemnification Provision").  The Indemnification

8  Provision, however, is subject to the limitation that CAARP is *not* bound to indemnify

9  Liberty Mutual if the company incurred liability due to its own "gross negligence" or

10 "willful misconduct."  (See Dkt. No. 26 at 4.)

11      The present controversy arises from a policy that Liberty Mutual, in its capacity as a

12 servicing carrier, issued to Joe Ten Berge ("Ten Berge").  As a commercial truck operator,

13 Ten Berge fell within the class of high-risk motorists for whom CAARP is intended.  In July

14 2003, when Liberty Mutual issued Ten Berge a truckers policy, Ten Berge owned a certain

15 1987 Great Dane box trailer ("the Trailer").  The Trailer was one of the vehicles specifically

16 listed on Ten Berge's Liberty Mutual policy.  However, in November 2003, Ten Berge

17 endeavored to sell the Trailer to Raymond Fulwider ("Fulwider") for $5,000.  As explained

18 further below, the legal validity and timing of this "sale" is in dispute.

19      The accident which set in motion the chain of events leading to this action occurred

20 on the evening of December 24, 2003.  At approximately 8:44 p.m., Fulwider was driving a

21 rig (comprised of a tractor and the Trailer) near Chiloquin, Oregon.  Fulwider lost control of

22 the rig, crossed into the southbound lane, and collided with a Dodge Durango containing

23 Kurtis and Tracee Harlan.  Kurtis Harlan sustained serious injuries.  Tracee Harlan—twenty-

24 nine years old at the time of the accident—was rendered a quadriplegic.

25      On November 23, 2005, the Harlans filed a complaint against Ten Berge in Orange

26 County Superior Court ("the Underlying Action").  Liberty Mutual originally accepted the

27 defense of Ten Berge, but it subsequently determined that as a result of the "sale" of the

28 Trailer from Ten Berge to Fulwider, Ten Berge did not have an insurable interest in the

1  Trailer.  Liberty Mutual accordingly denied coverage for Ten Berge and withdrew from its

2  defense of the Harlans' action against him.  When the Harlans asserted a $750,000 policy

3  limit settlement demand in August 2006, Liberty Mutual declined to participate on behalf of

4  Ten Berge.  In February 2007, Ten Berge and the Harlans entered into an $18 million

5  stipulated judgment of the Underlying Action.  Pursuant to their corresponding agreement,

6  Ten Berge assigned his rights against Liberty Mutual to the Harlans in exchange for their

7  promise to abstain from executing the judgment against him personally.

8       The Harlans and Ten Berge then each filed breach of contract/bad faith actions

9  against Liberty Mutual in April and May 2008, respectively (the "Bad Faith Litigation").

10 Each of the lawsuits alleged that Liberty Mutual had improperly denied coverage and a

11 defense to Ten Berge in the Underlying Action.  Liberty Mutual retained the law firm of

12 Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin") to handle these claims and

13 defend it in the Bad Faith Litigation.  The Bad Faith Litigation settled in late 2009, for many

14 million dollars more than the Harlans' original $750,000 policy limit settlement demand of

15 the Underlying Action.

16      On December 22, 2009, Liberty Mutual submitted a request for indemnification to

17 CAARP in the amount of $13,535,428.79.  In support of its request, Liberty Mutual provided

18 CAARP with its claim files regarding the Underlying Action, including a multitude of

19 privileged documents.  The privileged communications include its in-house counsels' legal

20 memoranda regarding the Underlying Action, and an opinion letter from outside counsel

21 Kevin McCurdy, whose firm was retained by Liberty Mutual in October 2006 to opine on the

22 company's decision to deny coverage in the Underlying Action.  Liberty Mutual also

23 produced Sheppard Mullin's bills from the Bad Faith Litigation.

24      CAARP ultimately concluded that Liberty Mutual's extracontractual liability was a

25 result of "gross negligence" or "willful misconduct" under the Indemnification Provision and

26 therefore denied Liberty Mutual's request, except for $750,000—Ten Berge's original policy

27 limit and the liability CAARP maintains Liberty Mutual "would have incurred had it acted

28 reasonably." (Dkt. No. 26 at 7.)

1    Liberty Mutual subsequently filed this lawsuit against CAARP for breach of the

2  Indemnification Provision.  The parties presently dispute whether Liberty Mutual must

3  produce: (1) attorney-client privileged documents from the Bad Faith Litigation,[1] and (2)

4  excerpts from the personnel file of Liberty Mutual's in-house attorney John Hartman.[2]

5  CAARP contends that Liberty Mutual has expressly and impliedly waived any privilege with

6  respect to the Bad Faith Litigation documents and that any privacy interests in Mr.

7  Hartman's personnel documents are outweighed by their relevance.

8                               **LEGAL STANDARD**

9    Under the Federal Rules of Civil Procedure, a party "may obtain discovery regarding

10  any nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant

11  information need not be admissible at the trial if the discovery appears reasonably calculated

12  to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  District courts

13  have broad discretion in determining whether evidence is relevant for discovery purposes.

14  See Surfvivor Media, Inc. v. Survivor Productions., 406 F.3d 625, 635 (9th Cir. 2005).

15    **A.  Waiver of Privilege**

16    As this is a diversity jurisdiction lawsuit, questions regarding the application of

17  attorney-client and work-product privileges are governed by California law.  See Fed. R.

18  Evid. 501.  A party's waiver of privilege may be either express or implied.  See Shooker v.

19  Superior Court, 111 Cal. App. 4th 923, 928 (2003).

20    An express privilege waiver occurs when a party voluntarily discloses a significant

21  portion of privileged communications, or consents to the disclosure thereof.  See Cal. Evid.

22  Code § 912 ("[T]he right of any person to claim a privilege provided by Section 945 (lawyer-

23  client privilege) . . . is waived with respect to a communication protected by the privilege if

24  any holder of the privilege, without coercion, has disclosed a significant part of the

25  communication or has consented to disclosure made by anyone").  "What constitutes a

26  significant part of the communication is a matter of judicial interpretation; however, the

27  ───────────────

28  [1] See Dkt. No. 26 at 9-10 (outlining requests 10, 11, 14, 16, and corresponding responses).
   [2] See Dkt. No. 26 at 10 (request no. 25 and response).

4

scope of the waiver should be determined primarily by reference to the purpose of the privilege." <u>Transamerica Title Ins. Co. v. Super. Ct.</u>, 188 Cal. App. 3d 1047, 1052-1053 (1987).

Although not specifically reflected in the California statutory law, the theory of *implied* privilege waiver is well-accepted.  <u>See</u> <u>Merritt v. Superior Court</u>, 9 Cal. App. 3d 721, 730 (1970); <u>Chicago Title Insurance Co. v. Superior Court</u>, 174 Cal. App. 3d 1142, 1149 (1985).  An implied privilege waiver is found where a party asserts that it relied on the advice of counsel or counsel's conduct, thus putting the attorney's state of mind or otherwise privileged communication directly at issue.  <u>See</u> <u>Weil v. Investment/Indicators, Research and Management, Inc.</u>, 647 F.2d 18, 24-25 (9th Cir. 1981); <u>see</u> <u>Handgards, Inc. v. Johnson & Johnson</u>, 413 F. Supp. 926, 929 (N.D. Cal. 1976) ("The deliberate injection of the advice of counsel into a case waives the attorney-client privilege as to communications and documents relating to the advice").  "[T]he person or entity seeking to discover privileged information can show waiver by demonstrating that the client has put the otherwise privileged communication directly at issue and that disclosure is essential for a fair adjudication of the action."  <u>S. Cal. Gas Co. v. Pub. Util. Comm'n</u>, 50 Cal.3d 31, 40 (1990).

"The scope of either a statutory or implied waiver is narrowly defined and the information required to be disclosed must fit strictly within the confines of the waiver."  <u>Transamerica Title Ins. Co.</u>, 188 Cal. App. 3d at 1052-1053.

**B. Right of Privacy**

The California Constitution bestows a broad right of privacy.  <u>See</u> Cal. Const. art. I, § 1; <u>El Dorado Sav. & Loan Assn. v. Super. Ct.</u>, 190 Cal. App. 3d 342, 345 (1987).  This right extends to discovery proceedings in civil actions.  <u>See</u> <u>San Diego Trolley, Inc. v. Super. Ct.</u>, 87 Cal. App. 4th 1083 (2001).  However, the constitutional right to privacy is not absolute and may be abridged to accommodate a compelling public interest.  <u>Moskowitz v. Super. Ct.</u>, 137 Cal.App.3d 313, 316 (1980).  "One such interest, evidenced by California's broad discovery statutes, is 'the historically important state interest in facilitating the ascertainment of truth in connection with legal proceedings.'"  <u>Id</u>.  (quoting <u>Britt v. Superior Court</u>, 20

1   Cal.3d 844, 857 (1978)).  "In the context of discovery of confidential information in

2   personnel files, even when such information is directly relevant to litigation, discovery will

3   not be permitted until a balancing of the compelling need for discovery against the

4   fundamental right of privacy determines that disclosure is appropriate." El Dorado, 190 Cal.

5   App. 3d at 346 (quoting Cutter v. Brownbridge, 183 Cal. App. 3d 836, 843 (1986)).

6                                              **DISCUSSION**

7          Defendant's Motion to Compel involves two categories of documents: (1) Bad Faith

8   Litigation attorney-client privileged documents, and (2) excerpts from the personnel file of

9   John Hartman, Liberty Mutual's in-house counsel.

10   **A.      Documents Relating to Bad Faith Litigation**

11          CAARP argues that Liberty Mutual's production of the claims file from the

12   Underlying Action in its entirety, including attorney-client privileged documents, expressly

13   waived the privilege with respect to any documents generated during the Bad Faith

14   Litigation—that is, that Liberty Mutual "has disclosed a significant part of the [Bad Faith

15   Litigation] communication[s]."  Cal. Evid. Code 912(a).  In the alternative, CAARP

16   contends that Liberty Mutual has impliedly waived the privilege as to those communications.

17          **1.  Disclosure of the Underlying Action Documents**

18          CAARP contends that while technically the products of two distinct lawsuits, the

19   disclosed attorney-client communications arising from the Underlying Action and those

20   made in connection with the Bad Faith Litigation are inextricably intertwined such that

21   Liberty Mutual's voluntary waiver of the privilege with respect to the Underlying Action

22   communications involves an express waiver with respect to the privileged Bad Faith

23   Litigation communications.  The Court disagrees.  The disclosed Underlying Action

24   communications are different from those made in the Bad Faith Litigation.  The former

25   involve advice regarding Liberty Mutual's decisions concerning whether to defend the

26   Underlying Action and the latter involve its decisions regarding the Bad Faith Litigation.  It

27   is thus unsurprising that CAARP does not and cannot cite a single case in which an insurer's

28   voluntary disclosure of "advice of counsel" documents arising from a coverage decision

constituted a waiver of the attorney-client privilege with respect to any privileged communications in subsequent breach of contract/bad faith litigation.

CAARP's response that this case is unique (hence the lack of legal authority) because Liberty Mutual is now seeking indemnification for the amount it paid to settle the Bad Faith Litigation is, in effect, an argument that Liberty Mutual has impliedly waived the privilege as to the advice it received in the Bad Faith Litigation. In other words, by seeking indemnification—and filing this action—Liberty Mutual has put its Bad Faith Litigation counsel's advice at issue. Once again, however, no caselaw supports CAARP's argument. Liberty Mutual has not produced any privileged documents from the Bad Faith Litigation and in its initial disclosures has not identified any of its Bad Faith Litigation counsel— whether in-house or out—as possible witnesses. Nor can CAARP point to any interrogatory responses or other statements that suggest that Liberty Mutual intends to defend the allegation of gross negligence by relying on the advice it received from Bad Faith Litigation counsel.

The cases upon which CAARP relies do not support its position. In <u>Wellpoint Health Networks, Inc. v. Superior Court</u>, 59 Cal.App.4th 110 (1997), the court held that it was improper for the trial court to find that the defendant had impliedly waived the attorney-client privilege until the plaintiff had filed a proper complaint: "Only then, and only if defendants' answer or discovery responses indicate the possibility of a defense based on thorough investigation and appropriate corrective response, can a finding of waiver be made." <u>Id</u>. at 129. Here, there is nothing in the record that "indicate[s] a possibility of a defense based on" Bad Faith Litigation counsel's advice. In <u>Handgards, Inc. v. Johnson & Johnson</u>, 413 F.Supp. 926 (N.D. Cal. 1976), the plaintiff made an antitrust claim alleging that defendants had filed patent infringement lawsuits in bad faith. In response, the defendants relied upon the testimony of the attorneys who had prosecuted the patent infringement actions. Despite that reliance, the defendants refused to produce their litigation files from these underlying patent infringement actions. <u>Id</u>. at 928. The trial court ordered production of the litigation files on the ground that the defendants had placed all the advice

7

United States District Court
Northern District of California

they received in connection with the prosecution of those actions at issue. Id. The same result obtains here. Liberty Mutual must disclose—and represents that it has disclosed—all of its files relating to the Underlying Action. There is nothing in Handgards, however, that suggests that Liberty Mutual must also disclose any advice rendered in the Bad Faith Litigation even though that advice could not have affected how Liberty Mutual handled the Underlying Action.

Liberty Mutual's current decision not to make an advice of counsel defense with respect to its conduct of the Bad Faith Litigation may be based on its view that the only question in this lawsuit is whether it was grossly negligent with respect to the Underlying Action; in other words, that its defense of the Bad Faith Litigation is not relevant to resolution of this lawsuit. Regardless of whether Liberty Mutual may subsequently change its position and seek to raise an advice of counsel defense with respect to its conduct of the Bad Faith Litigation, at this time it has not done so.

All that being said, to the extent Liberty Mutual is withholding on attorney-client privilege grounds Bad Faith Litigation documents which involve communications of any of the attorneys for whom the privilege has been waived in connection with the Underlying Action (for example, Mr. McCurdy or Mr. Hartman), such documents shall be identified on a privilege log. The Court cannot determine in the abstract whether Liberty Mutual has waived the privilege for such communications, if any exist.

**2. Disclosure of the McCurdy Documents**

Next, CAARP contends that Liberty Mutual's disclosure of the opinion of outside counsel Kevin McCurdy impliedly waives the privilege for the Bad Faith Litigation privileged communications. In particular, CAARP contends that because McCurdy did not render his advice until *after* Liberty Mutual had withdrawn its defense of the Underlying Action and refused the underlying plaintiffs' offer to settle for the policy limits, Liberty Mutual could not have relied on McCurdy's advice with respect to its handling of the Underling Action; in other words, McCurdy's opinion is no defense to CAARP's gross negligence allegation. Therefore, argues CAARP, Liberty Mutual must be relying on

United States District Court
Northern District of California

1   McCurdy as "after-the-fact" expert advice to argue, in effect, that "we must not have been

2   grossly negligent—look at what Mr. McCurdy had to say."  Liberty Mutual, however, asserts

3   that McCurdy's October 2006 advice is relevant to how it handled the Underlying Action

4   because his advice was rendered while the Underlying Action was still pending and Liberty

5   Mutual could have changed its position.

6          This Court need not resolve this factual dispute.  The Court finds that Liberty Mutual

7   is not attempting to rely on McCurdy's opinion as an improper "after-the-fact" justification

8   for its conduct.  Should the trial court determine that McCurdy's opinion is not relevant to

9   Liberty Mutual's handling of the Underlying Action, as CAARP contends, then Liberty

10  Mutual will not be able to rely on the opinion and there will be no unfairness.  Of course,

11  should Liberty Mutual subsequently attempt—and be allowed—to use McCurdy as "after the

12  fact" justification, Liberty Mutual may place its Bad Faith Litigation counsel's advice at

13  issue.  On the record currently before the Court, however, it has not yet done so.

14         **3.  Disclosure of the Bad Faith Litigation Billing Records**

15         Finally, CAARP contends in a footnote that Liberty Mutual's unredacted production

16  of its Bad Faith Litigation counsel's billing records disclosed certain legal strategies and

17  therefore constitutes a waiver as to any attorney-client privileged documents from that

18  litigation.  (Dkt. No. 26 at 12 n.5, No. 33 at 5 n.2.)  The only case upon which Liberty

19  Mutual relies for support, In re Grand Jury Witness v. United States, 695 F.2d 359 (9th Cir.

20  1982), merely held that a grand jury subpoena for attorney time records describing the

21  services performed by attorneys could intrude on the attorney-client relationship.  The court

22  therefore ordered an *in camera* review of the records to determine what records had to be

23  produced in response to the subpoena.  Id. at 362-363.  In other words, In re Grand Jury

24  Witness is not a privilege wavier case.

25         In any event, the Court agrees that some of the billing entries disclosed some of Bad

26  Faith Litigation counsel's legal strategies and thoughts; for example, the records include an

27  entry stating: "Analyzed and prepared top five reasons why Liberty Mutual erred in denying

28  coverage for Ten Berge."  (Dkt. No. 28 at 15.)  The Court is not persuaded, however, that the

1    billing record disclosures constitute a "significant part of the" privileged communications

2    between Liberty Mutual and its counsel such that Liberty Mutual has waived the privilege as

3    to its communications with Bad Faith Litigation counsel.  See Bank of the West v. Valley

4    National Bank of Arizona, 132 F.R.D. 250, 259 (N.D. Cal. 1990).  Further, Liberty Mutual

5    submitted the billing records to CAARP in support of its request that CAARP pay the bills

6    pursuant to the parties' indemnification agreement.  As the Bank of the West court noted,

7    such disclosures likely were required in light of its indemnification request.  Id.  In any

8    event, absent some indication that Liberty Mutual intends to use the billing records for any

9    purpose other than to support the reasonableness of the attorneys fees incurred in the Bad

10   Faith Litigation, the Court finds that their production has not expressly nor impliedly waived

11   the attorney-client privilege in connection with the Bad Faith Litigation.

12   **B.    Documents From John Hartman's Personnel File**

13          CAARP also moves to compel performance evaluation documents from the personnel

14   file of Mr. John Hartman, in-house attorney for Liberty Mutual.  Liberty Mutual responds

15   that Mr. Hartman's entire personnel file is protected by privacy, and therefore

16   undiscoverable.

17          There are certainly privacy concerns implicated in the production of an individual's

18   personnel file for discovery purposes.  However, Liberty Mutual has squarely placed Mr.

19   Hartman at the center of its defense of its handling of the Underling Action.  Liberty Mutual

20   has indicated an intent to rely heavily on Mr. Hartman's advice, even going so far as to

21   contend that he was the "gold standard" of attorneys at the company.  (See Dkt. No. 28 at 3 ¶

22   4.)  CAARP is entitled to discovery to rebut this contention and such discovery includes

23   performance-related documents in Mr. Hartman's personnel file.  In other words, in light of

24   Liberty Mutual's deliberate decision to place Mr. Hartman's competence at issue "the

25   historically important state interest in facilitating the ascertainment of truth in connection

26   with legal proceedings" represents a compelling public interest that trumps Liberty Mutual's

27   (actually Mr. Hartman's) privacy concerns.  Britt v. Superior Court, 20 Cal. 3d 844, 857

28   (1978).

1   Further, the Court concurs with CAARP's assertion that it cannot obtain the necessary

2   evidence of Mr. Hartman's job performance through other means.  For example, *ex post*

3   *facto* deposition testimony of Mr. Hartman or other Liberty Mutual employees regarding his

4   job performance will not prove as relevant or reliable as objective evaluations conducted

5   outside this lawsuit.  Further, the "personnel documents in Mr. Hartman's file prior to the

6   Harlan/Ten Berge matter are the best illustration of what Liberty Mutual knew or believed –

7   at the time of the [Underlying Action] – about Mr. Hartman's competence," and thus provide

8   the best evidence of the reasonableness of the company's choice to rely on his advice.  (Dkt.

9   No. 26 at 19.)   Liberty Mutual's assertion that its decision makers responsible for the

10  handling of the Underlying Action were not aware of Mr. Hartman's personnel file is of no

11  moment; that the decision makers were kept in the dark of some relevant information might

12  be evidence supporting a claim of gross negligence.

13  Accordingly, subject to the protections of an appropriate protective order, Liberty

14  Mutual shall produce documents regarding Mr. Hartman's job performance in his Home

15  Office Legal role from the year 2000 forward.

16  ## CONCLUSION

17  For the foregoing reasons, Defendant's Motion to Compel is DENIED in part and

18  GRANTED IN PART.  Liberty Mutual shall produce the ordered documents within 14 days

19  of the date of this Order.

20  **IT IS SO ORDERED.**

21  Dated: March 14, 2012

22  _____
    Jacqueline Scott Corley
23  United States Magistrate Judge